**Leroy HARPER, d/b/a Trustee for Leroy Harper's Employee's Pension Plan, Appellant,**

v.

**BUSINESS MEN'S ASSURANCE COMPANY, et al., Respondent.**

No. WD 46279.

Missouri Court of Appeals, Western District.

Jan. 18, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 1, 1994.

Application to Transfer Denied April 26, 1994.

Donald P. Herron, Kansas City, for appellant.

William F. Ford, Jr., Tonya O. Johnston Gage & Tucker, Kansas City, for respondent.

Before ULRICH, P.J., and SMART and ELLIS, JJ.

ULRICH, Judge.

Leroy Harper appeals from the judgment n.o.v. (notwithstanding the verdict) entered by the trial court in behalf of Business Men's Assurance Co. (BMA). The jury had awarded Mr. Harper $25,586.81 for damages, $1,821.82 punitive damages, and $1,500 for attorney's fees. Mr. Harper had sued BMA for paying to Ron Ragle the cash value of an insurance policy that Mr. Harper owned after Mr. Ragle forged Mr. Harper's name on a BMA surrender form. Mr. Ragle owned

an insurance brokerage and had represented Mr. Harper with several different insurance companies. The trial court set aside the jury verdict, finding as a matter of law that Mr. Ragle was a broker acting as Mr. Harper's agent and that Mr. Harper authorized delivery of the cash value of the policy by BMA to Mr. Ragle.

The trial court's judgment n.o.v. is affirmed.

Ronald Ragle owned and operated Ragle Insurance Company, an insurance brokerage. Mr. Ragle was authorized by 121 different insurance companies to transact the purchase of their insurance policies in behalf of his clients. He provided his services to Leroy Harper, who owned approximately thirty different insurance policies with seven different insurance companies when he met Mr. Ragle.

Mr. Harper purchased BMA life insurance policy No. L4099745 in 1968 from a BMA agent. In 1982, Mr. Harper began conducting business with Mr. Ragle. Through Mr. Ragle, Mr. Harper converted several different life insurance policies which he had purchased from different insurance companies into insurance policies purchased from Security Benefit Life Insurance Company. To effectuate these "roll-overs," Mr. Harper signed surrender forms for almost all of the policies that he owned. With Mr. Harper's authority, Mr. Ragle submitted these surrender forms to the insurance companies that insured Mr. Harper. The insurance companies then tendered checks representing the cash value of the policies to Mr. Ragle. The checks were payable to Mr. Harper, who then endorsed them, and the proceeds were used by Mr. Ragle to purchase new insurance policies ("rolled-over") for Mr. Harper.

In 1986, Mr. Harper discussed with Mr. Ragle "rolling-over" his last BMA insurance policy. At some time during Mr. Harper's relationship with Mr. Ragle, Mr. Harper asked Mr. Ragle if he could conduct business with BMA, and Mr. Ragle responded that he could and that he could "do insurance with anybody." Mr. Ragle advised Mr. Harper to convert the BMA policy into another BMA policy. Mr. Harper asked Mr. Ragle to effect the "roll-over" and authorized Mr. Ragle to "roll-over" the BMA policy into another BMA policy.

To effectuate the surrender of the life insurance portion of BMA policy L4099745 owned by Mr. Harper, Mr. Ragle, on March 19, 1986, submitted to BMA a surrender form on which he had forged Mr. Harper's signature. Unknown to Mr. Harper or to BMA, Mr. Ragle's Missouri State Insurance Broker's license had been suspended by state authorities before he submitted the form. BMA issued a check payable to Mr. Harper for the cash value of the life insurance portion of the policy and gave the check to Mr. Ragle. Mr. Ragle then forged Mr. Harper's name on the check and deposited the check into his account at the Kearney Commercial Bank. Mr. Ragle used the proceeds for his own benefit.

At the time the surrender form was presented to BMA, Mr. Ragle was authorized by BMA to transact business with the insurance company. An agreement entitled "Field Office Broker's Agency Agreement" existed between BMA and Mr. Ragle, recognizing Mr. Ragle as a broker and defining the scope of their business relationship. The agreement authorized Mr. Ragle to appoint sub-brokers, provided that BMA would pay "Broker commissions on premiums paid to [BMA] on account of policies issued and delivered upon applications procured" under the agreement, and prescribed as the Kansas and Missouri territory the area in which Mr. Ragle and his "sub-brokers" were authorized to procure applications for insurance. The agreement required Mr. Ragle to be duly licensed as required by applicable insurance laws.

When Mr. Ragle appeared at BMA to submit the surrender form for policy No. L4099745, an employee of BMA telephoned Mr. Harper to inform him that Mr. Ragle was at the insurance company presenting a form to surrender the insurance policy and sought a check totaling the cash value of the policy. Mr. Harper responded by saying that he was aware of Mr. Ragle's action and that Ragle was to "roll-over" the policy for him. Mr. Harper testified at trial that he understood that the policy was to be "rolled-over" into another BMA policy, but he did not claim to have been so explicit in his

conversation with the BMA employee on the telephone. Mr. Ragle was given BMA's check in the sum equaling the cash value of the insurance policy. BMA sent Mr. Harper a letter dated March 21, 1986, informing him that BMA had disbursed the value of the policy, $16,778.24, to Mr. Ragle on March 19, 1986.

Mr. Harper claimed at trial that he was unaware Mr. Ragle had obtained the cash value of the insurance policy, deposited the sum into his own account, and used the sum for his own benefit until sometime after these events. Mr. Harper did not communicate with BMA about the surrender of the policy until over a year after the transaction. Mr. Ragle had presented a false insurance policy to Mr. Harper which he represented to be a BMA policy. Mr. Harper assumed that Mr. Ragle had "rolled-over" his BMA policy into another BMA policy as he had been directed until he received an IRS Form 1099 from BMA in 1987. Receipt of the Form 1099 caused Mr. Harper to become suspicious, and he inquired of BMA about the transaction.

The standard for reviewing a judgment notwithstanding the verdict requires the appellate court to attribute as true the evidence most favorable to the verdict. *Glover v. Atchison, Topeka & Santa Fe Ry. Co.*, 841 S.W.2d 211, 212 (Mo.App.1992). A judgment notwithstanding the verdict is proper only if reasonable minds could not differ. *Id.* Review is a matter of law. *Id.*

■ Mr. Harper claims in points one and two on appeal that the trial court erred in setting aside the verdict and entering judgment for BMA because the evidence, he asserts, proved Ron Ragle was not his agent. Thus, the issue considered is whether Mr. Ragle was Mr. Harper's agent when Mr. Ragle submitted the forged form to BMA, received the check from BMA, forged Mr. Harper's signature on the check, and deposited the proceeds into his account.

The legal relationship of an insurance broker to client and insurance company is articulated by law. Section 375.012(1) defines for use in the chapter the term "broker," or "insurance broker," as "a natural person who acts or aids in any manner in negotiating contracts of insurance ... as an agent for

insured ... and not as an agent of an insuring company." The Missouri Supreme Court in *Morrow v. Loeffler*, 297 S.W.2d 549, 552 (Mo.1956), stated that "as a general rule, an insurance broker is agent for the insured. To constitute him otherwise, it must be shown that he was authorized in the particular instance to represent the insurer as its agent." Quoting *Knight v. Merchants & Mfrs. Ins. Co.*, 239 Mo.App. 107, 188 S.W.2d 77, 82 (Mo.App.1945).

■ Mr. Harper contends that the evidence at trial established Mr. Ragle was BMA's agent and not his. Mr. Harper alleges specifically BMA's admission that Mr. Harper's signature on BMA's check issued to Mr. Harper for the cash value of the life insurance policy was forged, payment of the policy amount to Mr. Ragle was not specifically authorized by Mr. Harper, Mr. Harper did not authorize Mr. Ragle to "rollover" the policy, and Mr. Ragle was not licensed by Missouri to act as a broker when he submitted the forged form and received the check from BMA, prove Mr. Ragle was not acting as his agent. These contentions, even if true, do not establish that Mr. Ragle was BMA's agent. The burden was Mr. Harper's as plaintiff to prove Mr. Ragle's agency relationship with BMA, for agency is not presumed. *Ringo v. Parliament Ins. Co.*, 616 S.W.2d 869, 871 (Mo.App.1981). Agency is a question of fact to be determined by the evidence. *Morrow v. Loeffler, supra,* at 552.

The evidence presented at trial established that Mr. Ragle conducted an insurance brokerage business and at sometime was a licensed insurance broker in Missouri. He was authorized by more than one hundred insurance companies to purchase insurance policies for clients. Because Mr. Ragle was an insurance broker doing business with Mr. Harper's authority that affected Mr. Harper's BMA insurance policy, he is presumed to have been Mr. Harper's agent. *Id.* The record does not disclose that Mr. Ragle did business with BMA except in Mr. Harper's name. The agreement between Mr. Ragle and BMA recognized Mr. Ragle's broker status. Mr. Ragle did not even receive commissions from BMA regarding Mr. Harper's in-

surance business. No evidence is disclosed in the record that BMA authorized Mr. Ragle to represent it as its agent. Payment of the cash value of Mr. Harper's BMA policy was an act that would not benefit BMA. Mr. Harper was Mr. Ragle's client before this transaction, and Mr. Ragle, in behalf of Mr. Harper, had converted several of Mr. Harper's thirty insurance policies into policies purchased from Security Benefit Life Insurance Company. The evidence established Mr. Ragle performed services for Mr. Harper, as an insurance broker, and verified the legal presumption that Mr. Ragle acted as Mr. Harper's agent with BMA.[1] Points one and two are denied.

Mr. Harper raises several additional issues on appeal. He contends that his interest bearing "side fund" insurance policy with BMA continued to draw interest at 9% per annum from the date that BMA's check was received by Mr. Ragle on March 18, 1986, and that, in addition to the amount erroneously paid to Mr. Ragle, he is entitled to this additional interest, too. He claims the trial court erroneously determined that he was not entitled to damages for the vexatious refusal of BMA to pay him the proceeds of the policy, and he asserts the court erred when it determined that the verdict was not supported by the evidence. These issues are moot because of the ruling on points one and two, and they are denied.

As a matter of law, the trial court's judgment notwithstanding the verdict was correct. The judgment n.o.v. is affirmed.

All concur.

---

1. Mr. Harper claims that Mr. Ragle's brokerage license suspension by state authorities was evidence that he was not, and could not, serve as his agent. Additionally, Mr. Harper asserts the suspension of Mr. Ragle's brokerage license and the failure of BMA to check "with the State of Missouri to determine if Mr. Ragle's license was current" was probative regarding his allegation seeking damages for vexatious refusal to pay his demand for a sum equaling the cash value of the policy plus interest. Mr. Harper does not raise the issue whether because BMA dealt with Mr. Ragle as an insurance broker when his brokerage license was suspended, BMA is liable per se for his loss that resulted from Mr. Ragle's criminal conduct.

Whether an insurance company should be compelled to determine through the Division of Insurance the status of a broker's license before dispersing to the broker funds of an insured is not considered in this case, and the issue may appropriately be one for the legislature's consideration.